UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x   Case No. 1:24-cv-03280-NRB
LORENZO ROBERT SAVAGE III,

                Plaintiff,

      - against -

ASSOCIATED NEWSPAPERS LTD. and
MAIL MEDIA, INC.,

                Defendants.
--------------------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**
<u>**COMPLAINT**</u>

**LAW OFFICE OF MARK E. GOIDELL**
*Attorney for Plaintiff*
666 Old Country Road, Suite 700
Garden City, New York 11530
(516) 683-0001
mark@goidell.com

## <u>TABLE OF CONTENTS</u>

Table of Authorities ............................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 2

    Procedural History ........................................................................................................... 2

    Factual Allegations .......................................................................................................... 3

ARGUMENT ......................................................................................................................... 7

POINT I .................................................................................................................................. 7

STANDARDS FOR MOTION TO DISMISS....................................................................... 7

POINT II ................................................................................................................................. 8

THE ARTICLE IS REASONABLY SUSCEPTIBLE TO A PLAUSIBLE DEFAMATORY
MEANING............................................................................................................................. 8

    New York Law Applies .................................................................................................... 8

    General Standards For Determining Defamatory Meaning ............................................. 8

    The Defamatory Meaning Of The Article Is Readily Apparent ................................... 10

        The Fabricated Text Messages.................................................................................. 15

POINT III ............................................................................................................................. 16

PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT ................. 16

CONCLUSION.................................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. CH Energy Group, Inc.,*
   58 A.D.3d 1102 (3d Dep't 2009) ........................................................................................8, 13

*Alphonse Hotel Corporation v. Tran,*
   828 F.3d 146 (2d Cir. 2016) .....................................................................................................8

*Armstrong v. Simon & Schuster, Inc.,*
   85 N.Y.2d 373 (1995) .....................................................................................................7, 9, 14

*Aronson v. Wiersma,*
   65 N.Y.2d 592 (1985) ...............................................................................................................9

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..................................................................................................................7

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ..................................................................................................................7

*Ben-Oliel v. Press Pub. Co.,*
   251 N.Y. 250 (1929) ...............................................................................................................15

*Celle v. Filipino Reporter Enterprises Inc.,*
   209 F.3d 163 (2d Cir. 2000) ...............................................................................................9, 12

*Chiavarelli v. Williams,*
   256 A.D.2d 111 (1st Dep't 1998) ...........................................................................................13

*Clevenger v. Baker Voorhis & Co.,*
   8 N.Y.2d 187 (1960) ...............................................................................................................15

*Crespo v. Franco,*
   2024 WL 4188356, No. 22-cv-7345-PKC (S.D.N.Y. Sept. 13, 2024) .....................................3

*Davis v. Brown,*
   211 A.D.3d 524 (1st Dep't 2022) ...........................................................................................14

*Geraci v. Probst,*
   15 N.Y.3d 336 (2010) ...............................................................................................................8

*Goldfarb v. Channel One Russia,*
   663 F.Supp.3d 280 (S.D.N.Y. 2023) .......................................................................................14

*Golub v Enquirer/Star Group, Inc.,*
   89 N.Y.2d 1074 (1997) .............................................................................................................8

*Henry v. Fox News Network LLC*,
    629 F.Supp.3d 136 (S.D.N.Y 2022)................................................................16

*Hinsdale v Orange County Publications, Inc.*,
    17 N.Y.2d 284 (1966) ....................................................................................16

*Hope v Hearst Consolidated Publications, Inc.*,
    294 F.2d 681 (2d Cir. 1961), *cert. denied* 368 U.S. 956 (1962)...........................12

*Jacob v. Lorenz*,
    626 F.Supp.3d 672 (S.D.N.Y. 2022).................................................................14

*James v. Gannett Co., Inc.*,
    40 N.Y.2d 415 (1976) ......................................................................................9

*Joyce v. Thompson Wigdor & Gilly LLP*,
    2008 WL 2329227, No. 06-cv-15315-RLC-GWG (S.D.N.Y. June 3, 2008) .........................13

*Julian v American Business Consultants, Inc.*,
    2 N.Y.2d 1 (1956) ..........................................................................................12

*Karedes v. Ackerley Group, Inc.*,
    423 F.3d 107 (2d Cir. 2005)............................................................................10

*Leser v. Penido*,
    62 A.D.3d 510 (1ˢᵗ Dep't 2009).......................................................................15

*Levin v. McPhee*,
    119 F.3d 189 (2d Cir. 1997)............................................................................14

*LoanStreet, Inc. v. Troia*,
    2023 WL 5836237, No. 21-cv-6166-NRB (S.D.N.Y. Sept. 8, 2023)................................10, 11

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
    797 F.3d 160 (2d Cir. 2015)............................................................................17

*Lunney v. Prodigy Service Company*,
    94 N.Y.2d 242 (1999) ....................................................................................15

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020)...............................................................................7

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)............................................................................17

*Mencher v. Chesley*,
    297 N.Y. 94 (1947) ........................................................................................13

*Netzer v. Continuity Graphic Associates, Inc.*,
    963 F.Supp. 1308 (S.D.N.Y. 1997) ........................................................9

*November v. Time Inc.*,
    13 N.Y.2d 175 (1963) ..........................................................................9

*Obra Pia Ltd. v. Seagrape Investors LLC*,
    2021 WL 1978545, No. 19-cv-7840-RA (S.D.N.Y. May 18, 2021) ......................17

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019)....................................................................8

*Rall v. Hellman*,
    284 A.D.2d 113 (1st Dep't 2001)..............................................................15

*Scacchetti v. Gannett Co., Inc.*,
    90 A.D.2d 985 (4th Dep't 1982) ...............................................................13

*Scott v. Cooper*,
    215 A.D.2d 368 (2d Dep't 1995) ..............................................................13

*Staehr v. Hartford Financial Services Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008)....................................................................1, 3

*Thoubboron v. Convery*,
    306 A.D.2d 521 (2d Dep't 2003) ..............................................................13

*Wassermann v. Haller*,
    216 A.D.2d 289 (2d Dep't 1995) ..............................................................13

*Winter v. Pinkins*,
    2016 WL 1023319, No. 14-cv-8817-RKS (S.D.N.Y March 8, 2016) ....................17

*Yantha v. Omni Childhood Center, Inc.*,
    2013 WL 5327516, No. 13-cv-1948-ARR-JMA (E.D.N.Y. Sept. 20, 2013) ..........15

**Statutes**

Fed. R. Civ. P. 12(b)(6)............................................................................2, 7

Fed. R. Civ. P. 15(a)(2)............................................................................17

## PRELIMINARY STATEMENT

Defendants published an article (the "Article") which falsely reported that plaintiff intervened upon the request of "officials" in Washington, D.C. to surreptitiously extricate Hunter Biden, the son of Joseph Biden, from a night of drug use while patronizing a prostitute, and falsely attributed a series of text messages to plaintiff in furtherance of this secret mission.

Defendants contend that the Article actually depicts plaintiff in a favorable light, arguing that it is a "laudable" description of plaintiff as a crime fighter. (Defendants' Memorandum of Law [ECF 26], p. 1). Defendants' strained construction should be rejected. Nothing about the Article portrays plaintiff as acting in some "laudable" law enforcement capacity. Instead, fair-minded readers understood the Article to express or imply that plaintiff acted as a rogue vigilante – that he misused his power and influence as a former high ranking law enforcement officer to obtain favorable and unauthorized treatment for the son of the then former Vice President. The depiction of plaintiff both as a person who misused his position, and separately, as a political partisan, can and did cause substantial harm to plaintiff in his profession as a private security contractor, which requires a reputation of honesty and integrity, the absence of political or other bias, and relative anonymity to attract and conduct business.

Indeed, the public reports of the bogus text messages and misconduct attributed to plaintiff were sufficient to prompt Rep. James Comer, a high-ranking Congressman who was and is the chairman of the House Oversight Committee, to publicly announce an official investigation into the perceived abuse of power by the United States Secret Service ("USSS" or "Secret Service") in extending unauthorized favors to the Biden family.[1] Only the defendants ascribe anything

---

[1] *See*, e.g., https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden. The Court is permitted to take judicial notice of news reports, rather than the facts set forth therein. *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d

"laudatory" to plaintiff arising from the conduct falsely reported by defendants.

Based on the strained reading advocated by defendants, they move to dismiss the Complaint, primarily arguing that the Article is not susceptible to a defamatory meaning. Defendants are incorrect. The Article sets forth a plausible defamatory meaning(s) and the defendants' motion to dismiss must therefore be denied.

## STATEMENT OF FACTS

### *Procedural History*

Plaintiff commenced this action on April 30, 2024 by filing the Complaint, [ECF 1], alleging a single count of defamation per se.

On August 12, 2024, defendants filed a pre-motion letter expressing their intent to move to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). [ECF 16]. The sole ground for dismissal set forth in the pre-motion letter was that the Article was not susceptible to a defamatory meaning. Plaintiff responded by letter dated August 14, 2024, [ECF 17], in which plaintiff contended that the defamatory meaning of the Article was readily apparent and constituted defamation per se, and alternatively, it constituted defamation per quod in light of the widespread publicity of the fabricated text messages prior to the publication of the Article.

By Order dated September 10, 2024 [ECF 18], the Court provided plaintiff with leave to amend the Complaint "if … he can assert additional allegations to cure any alleged deficiencies **raised by defendants' letter**…" (emphasis added). Plaintiff did not amend the Complaint.[2]

---

406, 424-25 (2d Cir. 2008). Other reports and broadcasts depicted plaintiff as an unsavory and rogue "fixer."

[2] As set forth below, plaintiff conditionally requests leave to amend the Complaint to allege special damages and other limited relevant circumstances, but only if the Court determines that the allegations of the Complaint are insufficient to plausibly allege that the Article is reasonably susceptible to a defamatory connotation.

***Factual Allegations***

The facts are taken from the relevant allegations of the Complaint and from the Article, which is annexed to the Declaration of Robert Balin [ECF 27-1], and was previously emailed to the Court upon request on September 5, 2024, and from public news reports about which the Court is empowered to take judicial notice.[3]

Plaintiff is a highly-decorated and long-time former Secret Service agent who was in charge of the USSS Los Angeles Field Office from 2015 until November 2017. (Complaint ¶¶ 12-14). In that capacity, plaintiff "oversaw all Secret Service protective, investigative, and protective intelligence operations conducted by that office, including three resident offices located in Riverside, Santa Ana, and Ventura, California." (*Id.* ¶ 15). He retired from the Secret Service in April 2018. (*Id.* ¶ 12).

Defendants publish an online website known as the Daily Mail. (*Id.* ¶¶ 6-7). On October 2, 2023, defendants published the Article on the Daily Mail website in which defendants revived earlier false reports that plaintiff abused his position as a retired Secret Service agent during the night of May 24, 2018 by intervening on behalf of Joe Biden to stop his son, Hunter Biden, from a night of debauchery and illegal financial transactions from a bank account(s) associated with Joe Biden.

The full context of the false accusations against plaintiff is set forth earlier in the Article. The Article reported that financial crime investigators with the Department of Treasury and Wells

---

[3] *See Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 424-25 (2d Cir. 2008) (court can take judicial notice of the content of public reporting for the fact of their existence and not for the truth of their contents); *Crespo v. Franco*, 2024 WL 4188356, at *4, No. 22-cv-7345-PKC (S.D.N.Y. Sept. 13, 2024) ("The Court may take judicial notice of public documents such as news articles and public reports for the fact that they were published but not for the truth of the statements therein.").

Fargo Bank identified payments by Hunter Biden to individuals suspected of prostitution and drug dealing. Further, the Article reported that in May 2018, Hunter Biden "engaged in a hooker and drug-fueled binge" at a hotel in Los Angeles, California.

> The Article then "reports" allegations relating to plaintiff that are entirely untrue:

> His binge only ended on May 24, 2018 when then-recently retired LA Secret Service chief Robert Savage texted him threatening to break into the room, telling him that 'DC is calling me every 10' and that he was working on 'Celtic's account' – the Secret Service codename for Joe Biden when he was Vice President.

> The Article included a hyperlink to an article published in 2021 which falsely reported that text messages between plaintiff and Hunter Biden were found on the notorious and well-publicized laptop belonging to Hunter Biden. (*Id*. ¶¶ 22-23).[4]

The hyperlinked article displays a screenshot of the fabricated text messages, and sets forth in relevant part the following:

> A little more than two hours later, however, [Hunter Biden] would be receiving texts from a very different person.

> Labelled as from Robert Savage III, a former Secret Service agent who until that month had been in charge of the agency's Los Angeles field office, the Post reports, he texts him at 6.37pm: 'H – I'm in the lobby come down. Thanks, Rob.'

> '5 minutes,' Hunter answers.

> Savage's attorney told the Post that he had never been in contact with Hunter Biden, and said that he was retired before the exchange took place. He referred to the messages as 'fabricated text messages.'

> DailyMail.com identified the messages on Hunter's laptop, validated earlier this year by cyber forensic experts as authentic.

> 'Come on H, this is linked to Celtic's account,' Savage replied five minutes later, using the Secret Service code name for Joe Biden when he was vice president,

---

[4] The hyperlinked article was first published in June 2021, and is accessible by the hyperlink embedded in the Article and still available online as follows: https://www.dailymail.co.uk/news/article-9715373/Joe-Biden-accidentally-payed-Hunters-escort-Chateau-Marmont.html.

the Post reported. 'DC is calling me every 10. Let me up or come down. I can't help if you don't let me H.'

The 2021 hyperlinked article was only one of many widespread false reports that the text messages attributed to plaintiff were found on Hunter Biden's laptop, and which identified plaintiff as a Secret Service agent formerly in charge of the Los Angeles Field Office. (Complaint, ¶ 22). In fact, those text messages were fabricated, the attribution of the text messages to plaintiff was fabricated, and the fabrications were readily apparent even upon a cursory review. (*Id*. ¶¶ 24-26).

The Article sets forth several false allegations. ***First***, the Article falsely reports that "officials" in Washington, D.C. asked Savage to investigate. In fact, at that time Savage was not employed as a Secret Service agent and he retired the preceding month, after being inactive for several months before that. In fact, plaintiff was not requested to intervene or investigate by "officials" or by anyone else. ***Second***, the Article falsely reports or implies that plaintiff used his alleged position to end the "binge" in which Hunter Biden was engaged. In fact, Savage was never in contact with Hunter Biden, did not intervene, and did not engage Hunter Biden that night or at any other time. ***Third***, the Article falsely attributes a series of text messages to plaintiff, during which plaintiff texted Hunter Biden and "threaten[ed] to break into [his] room, telling him that 'DC is calling me every 10,' and that he was working on 'Celtic's account' – the Secret Service codename for Joe Biden when he was Vice President." (*Id*. ¶ 27). In fact, Savage did not engage in any text messages with Hunter Biden then or at any other time, did not receive calls from "DC," and was not working on the "Celtic's account." (*Id*. ¶¶ 25, 29).

Defendants were actually aware of the falsity of these allegations or defendants recklessly disregard the truth. (*Id*. ¶¶ 25, 29).

The Article has caused plaintiff to suffer both general and special damages, including but

not limited to lost business opportunities for his private security business. (*Id*. ¶ 42).[5]

***Public Reporting***

In the aftermath of the revived public reporting of the text messages and intervention falsely attributed to plaintiff, Rep. James Comer, Chairman of the United States Congressional House Oversight Committee, announced an investigation into what he characterized as the "bizarre" conduct of the USSS, specifically identifying the (false) reports of plaintiff's May 2018 alleged interaction with Hunter Biden: "There are numerous instances where the Secret Service came and tried to bail Hunter out when he was in a jam, when he was in California and getting in all kinds of trouble, getting kicked out of a very exclusive hotel there… So there was about a two-and-a-half-year period there where the American people weren't providing Secret Service protection for the Bidens, yet there are numerous instances where the Secret Service always showed up to try to help Hunter Biden. It's bizarre." [6]

Rep. Comer's comments followed a well-publicized report of the bogus text messages attributed to plaintiff, popularly  known as the "Marco Polo Report," published online in October 2022, which falsely reported that the text messages attributed to plaintiff were found on Hunter Biden's laptop computer.[7]

---

[5] If the Court determines that special damages must be alleged, plaintiff requests that the Court grant leave to file an amended complaint which specifies the economic harm caused by the Article. (*See* Point III, below, and the Declaration of plaintiff Lorenzo Robert Savage III).

[6] https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden, reproduced as Exhibit A to the Declaration of Mark E. Goidell.

[7] *See* https://archive.org/details/report-on-the-biden-laptop-marco-polo-9624/page/292/mode/2up?view=theater, pp. 250-251, reproduced as Exhibit B to the Declaration of Mark E. Goidell.

## ARGUMENT

### POINT I

## STANDARDS FOR MOTION TO DISMISS

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To present a plausible claim, the "pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). The facts alleged must be enough "to raise a right to relief above the speculative level." *Id.*

The Court "is required to accept all well-pleaded factual allegations in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020) (quotation marks omitted). Nevertheless, well-pleaded factual allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

Regarding the sufficiency of pleading defamation claims, the New York Court of Appeals has "recognize[d] as well a plaintiff's right to seek redress, and not have the courthouse doors closed at the very inception of an action, where the pleading meets a minimal standard necessary to resist dismissal of a complaint." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 379 (1995).

Here, plaintiff sufficiently alleges a plausible defamation claim against the defendants, including that the Article is reasonably susceptible to a defamatory meaning(s).

**POINT II**

**THE ARTICLE IS REASONABLY SUSCEPTIBLE TO A PLAUSIBLE DEFAMATORY
MEANING**

*New York Law Applies*

Plaintiff agrees with defendants that for the purpose of determining this motion to dismiss,

the Court should apply the law of the State of New York. *Alphonse Hotel Corporation v. Tran*,

828 F.3d 146, 152 (2d Cir. 2016) ("Under New York choice-of-law rules, where the parties agree

that a certain jurisdiction's law controls, this is sufficient to establish choice of law.") (quotation

marks and alteration omitted).

*General Standards For Determining Defamatory Meaning*

"Under New York law a defamation plaintiff must establish five elements: (1) a written

defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4)

falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New

York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

A statement is defamatory if it tends to expose a person to hatred, contempt or aversion, or

to induce an evil or unsavory opinion of the plaintiff in the minds of a substantial number of the

community. *Golub v Enquirer/Star Group, Inc.*, 89 N.Y.2d 1074, 1076 (1997). Statements that

tend to disparage a person in his or her profession or business are defamatory per se without the

necessity of alleging or proving special damages. *Geraci v. Probst*, 15 N.Y.3d 336, 344 (2010)

("Damages will likewise be presumed for statements that charge a person with committing a

serious crime or that would tend to cause injury to a person's profession or business."). Similarly,

allegations imputing incompetence or unfitness for a plaintiff's trade or profession are defamatory

per se. *See*, e.g., *Allen v. CH Energy Group, Inc.*, 58 A.D.3d 1102, 1103 (3d Dep't 2009) (false

statement by plaintiff's employer that plaintiff, a customer service representative, defecated on

8

sidewalk outside of employer's office is defamatory per se).

"Whether a statement is susceptible of a defamatory meaning is a threshold question of law to be resolved by the court. If the statement complained of is susceptible of more than one meaning, at least one of which is defamatory, the claim must go to the jury." *Netzer v. Continuity Graphic Associates, Inc.*, 963 F.Supp. 1308, 1324 (S.D.N.Y. 1997). "If the statement is susceptible of only one meaning the court must determine, as a matter of law, whether that one meaning is defamatory. If the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Celle  v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (internal citations and quotation marks omitted); *see also James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419 (1976) ("If the contested statements are reasonably susceptible of a defamatory connotation, then it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader.") (quotation marks omitted).

In determining whether statements are reasonably susceptible to a defamatory connotation, "the court must give the disputed language a fair reading in the context of the publication as a whole." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380 (1995). Challenged statements are not to be read in isolation but must be read as the average reader would against the "whole apparent scope and intent" of the writing. *November v. Time Inc.*, 13 N.Y.2d 175, 178 (1963). "The words must be construed in the context of the entire statement or publication as a whole, [and] tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 65 N.Y.2d 592, 593-94 (1985). With equal emphasis, "courts

are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous" *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) (citation and quotation marks omitted). This Court has reiterated that principle. *LoanStreet, Inc. v. Troia*, 2023 WL 5836237, at *11, No. 21-cv-6166-NRB (S.D.N.Y. Sept. 8, 2023) ("Courts should not strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous"). (quotation marks omitted).

Here, defendants strain to find a non-defamatory connotation.

### The Defamatory Meaning Of The Article Is Readily Apparent

The Article taken as a whole is readily susceptible to a defamatory meaning. At a minimum, the gist of the Article is that (i) plaintiff misused his authority as a retired Secret Service agent to extract Hunter Biden from difficulty, (ii) plaintiff provided unauthorized protection and services to Hunter Biden, (iii) plaintiff unethically attempted to cover up the personal affairs of the son of Joe Biden by improperly intervening in a seemingly official capacity, and/or (iv) plaintiff surreptitiously undertook an unauthorized protective assignment following his retirement. The Article depicts plaintiff as a rogue law enforcement officer in the performance of ex-officio political or personal favors, who disregarded protocols and lines of command to protect the son of the former Vice President of the United States. Contrary to defendants' contention, the defamatory meaning of the Article as it relates to Mr. Savage is not strained but is instead readily understood by a typical reader. It is defendants' contention that is strained. At a minimum, there are alternative readings that require denial of the motion to dismiss.

In their argument, defendants violate the fundamental principle that the Article must be read in its full context, as the average reader would read the Article. Defendants myopically define the "Challenged Statement" as the final paragraph of the Article while oblivious to the fabricated

10

text messages, the hyperlinked 2021 article, and the overall context of the Article. (Defendants' Memorandum of Law, p. 4).

From this narrow perspective, defendants argue that the Article is limited to the following allegations: (1) Hunter Biden engaged in a hooker and drug-fueled binge at a Los Angeles hotel; (2) Hunter Biden made multiple payments to prostitutes using a bank account(s) linked to Joseph Biden; (3) officials in Washington, D.C. asked plaintiff, a retired USSS agent, to investigate; and (4) plaintiff put an end to Hunter Biden's binge. (Defendants' Memorandum of Law, p. 9). Defendants assert that "the Article merely portrays Savage as forcefully intervening to stop Hunter's illegal activities." (*Id*. p. 10).

Defendants conveniently omit the false attribution of text messages to Savage, which express that he was working – without authority – for then former Vice President Joe Biden, at a time when Hunter Biden had no USSS protection and while Savage was retired. The fair inference from these facts, disregarded by defendants, is that plaintiff was acting as a rogue pseudo-cop operating surreptitiously for the private benefit of one person and/or his family.

Defendants also conveniently ignore that the Article falsely reports that Savage agreed to perform and actually performed a law enforcement task for "officials" while he was retired. The fair inference is that he was performing unauthorized work and engaged in a cover-up of Hunter Biden's alleged misconduct on behalf of the then former Vice President.[8]

There is nothing strained or artificial about these conclusions. In fact, the Chairman of the United States Congressional House Oversight Committee came to similar conclusions, regardless of any partisan motivation for doing so, when he announced an investigation into what he

---

[8] Defendants also conveniently ignore the fabricated text message, the false attribution of which to plaintiff is defamatory, as set forth below on pp. 15-16.

characterized as the "bizarre" conduct of the USSS, specifically identifying the (false) reports of plaintiff's May 2018 conduct.[9] At least in federal court, a person's understanding of the meaning of a publication is appropriately considered. *Hope v Hearst Consolidated Publications, Inc.*, 294 F.2d 681, 683, 687-688 (2d Cir. 1961), *cert. denied* 368 U.S. 956 (1962) (admitting into evidence testimony of witnesses who understood publication to be of and concerning plaintiff).[10]

Even without considering reports of the opinions of others regarding the plaintiff's conduct as falsely attributed to him in the Article, the lies reported in the Article are far more than merely reasonably susceptible to defamatory connotations. By falsely imputing to plaintiff misconduct as a rogue vigilante, who engaged in unauthorized law enforcement work, and provided improper and surreptitious cover to benefit the Biden family, plaintiff's reputation as a fair, even-handed, and impartial provider of security services has been seriously undermined.[11]

A false accusation that demonstrates character traits inappropriate or inconsistent with the proper conduct of a plaintiff's business or profession is defamatory per se. "One useful rule is that a writing which **tends** to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." *Celle*, 209 F.3d at 179 (emphasis in original) (internal quotation marks omitted). "Words which affect a person in his or her profession by imputing to him or her **any kind** of fraud, dishonesty, misconduct, or unfitness in

---

[9] https://www.foxnews.com/media/top-republican-calls-investigation-secret-services-bizarre-actions-help-hunter-biden, reproduced as Exhibit A to the Declaration of Mark E. Goidell.

[10] As noted in *Hope*, New York state courts apparently follow a minority rule that excludes consideration of such opinion evidence. *Julian v American Business Consultants, Inc.*, 2 N.Y.2d 1, 19 (1956) (witnesses precluded from testifying to their opinions regarding defamatory quality of publication).

[11] It should be self-evident that these traits are essential to the success of a provider of security services like plaintiff. In the event that the Court determines that the allegations of the Complaint are insufficient in this regard, it is respectfully requested that plaintiff be granted leave to amend the Complaint accordingly. (*See* accompanying Declaration of Plaintiff Lorenzo Robert Savage III).

conducting one's profession may be actionable." *Wassermann v. Haller*, 216 A.D.2d 289, 289 (2d Dep't 1995) (emphasis added).

Courts have consistently held that words that tend to injure a party in his or her business or profession are reasonably susceptible of a defamatory meaning. *Allen*, 58 A.D.3d at 1103 (false accusation that plaintiff, a customer service representative, defecated on sidewalk outside of employer's office is defamatory per se because it disqualifies plaintiff from reliable and credible public interaction); *Thoubboron v. Convery*, 306 A.D.2d 521, 522 (2d Dep't 2003) (press release accusing plaintiff, a former sheriff, of using an aircraft owned by the sheriff's department to take personal trips at the taxpayers' expense was defamatory); *Scott v. Cooper*, 215 A.D.2d 368, 368, 369 (2d Dep't 1995) (accusations that chief of police engaged in, among other things, "misconduct regarding his official duties" and "coverups of criminal activities" "tend[ed] to disparage [plaintiff] in his profession."); *Joyce v. Thompson Wigdor & Gilly LLP*, 2008 WL 2329227, at *12, No. 06-cv-15315-RLC-GWG (S.D.N.Y. June 3, 2008) (report and recommendation) (false accusation that plaintiff lied about her health to avoid termination imputes dishonesty, which is incompatible with characteristics required for plaintiff's job); *Chiavarelli v. Williams*, 256 A.D.2d 111, 113 (1st Dep't 1998) (accusation of conduct that suggest plaintiff's unfitness for job is defamatory per se).

False statements published by a defendant which disparage a plaintiff in the performance of his or her official governmental duties are also defamatory per se. *Mencher v. Chesley*, 297 N.Y. 94, 100 (1947) ("A charge that a public official misused his position was guilty, in effect, of malfeasance in office is of course defamatory."); *Scacchetti v. Gannett Co., Inc.*, 90 A.D.2d 985, 985-986 (4th Dep't 1982) (article accusing a police officer of "spew[ing] obscenities about the judge who sentenced his brother to federal prison ... tend[ed] to injure him in his profession as a law enforcement officer.").

Defendants apparently conflate defamatory connotations in a defamation per se claim with a claim for defamation by implication. "New York recognizes a distinction between a defamatory connotation from statements that are alleged to be expressly false and false suggestions, impressions and implications arising from otherwise truthful statements." *Goldfarb v. Channel One Russia*, 663 F.Supp.3d 280, 297 n.7 (S.D.N.Y. 2023) (quotation marks and alterations omitted). This distinction was determinative in *Armstrong*, where the New York Court of Appeals rejected a defense that a publication constituted defamation by implication and determined instead that it was reasonably susceptible to a defamatory connotation as defamation per se. "Rather, this is, as plaintiff insists, a case of allegedly false statements of verifiable fact, with inferences flowing from those facts, and he bears the burden of proving the alleged falsity as well as the other elements of his claim. Those standards are well established in our law." *Armstrong*, 85 N.Y.2d at 381. *See also Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997) ("Such **implications** … are statements that could convey a defamatory **connotation**.") (emphasis added).[12]

This distinction was also critical in *Davis v. Brown*, 211 A.D.3d 524, 525 (1st Dep't 2022), where a letter not defamatory on its face was nevertheless found to be reasonably susceptible to a defamatory connotation because of the context in which it was published. The letter accused plaintiff, a Dean of Graduate Studies at Fashion Institute of Technology, of being "culturally insensitive" in the presentation of a fashion show. Among other things, the letter falsely "implied that plaintiff was responsible for the show, was aware of the accessories, could approve them, and failed to respond to student concerns." *Id*. at 526. As a result, the fair inference was that plaintiff

---

[12] Plaintiff does not seek to invoke defamation by implication because that claim applies to publications that are facially truthful but involve false suggestions, impressions, or implications. *Jacob v. Lorenz*, 626 F.Supp.3d 672, 694 (S.D.N.Y. 2022). Here, the conduct and words attributed to plaintiff in the Article, the 2021 hyperlinked article, and the fabricated text messages are all false. Libel *per quod* is addressed in Point III, below.

was a racist.

Here, likewise, the inferences flowing from the facts falsely reported in the Article are easily discerned by the average reader: Plaintiff was characterized as a rogue law enforcement agent who engaged in unauthorized law enforcement work, and exerted his influence as a retired Secret Service agent to provide improper and surreptitious cover to benefit the Biden family.

### The Fabricated Text Messages

Other than to fit their narrative that the Article portrays plaintiff as laudable crime fighter, defendants do not address the fabricated text message falsely attributed to plaintiff.

It is well-established that "[w]here, as here, an act of [ ] impersonation imputes facts to the person impersonated that damage him in his trade or profession, a cause of action for libel per se is adequately pleaded." *Rall v. Hellman*, 284 A.D.2d 113, 113 (1st Dep't 2001) (email falsely attributed to plaintiff but not about plaintiff that were not reflective of his views); *Lunney v. Prodigy Service Company*, 94 N.Y.2d 242, 248 (1999) (vulgar and threatening internet posts and email message falsely attributed to plaintiff but not about plaintiff were defamatory because they were ascribed to plaintiff); *Leser v. Penido*, 62 A.D.3d 510, 510 (1st Dep't 2009) (postings on internet falsely attributed to plaintiff were defamatory); *Yantha v. Omni Childhood Center, Inc.*, 2013 WL 5327516, at *5, No. 13-cv-1948-ARR-JMA (E.D.N.Y. Sept. 20, 2013) (healthcare reimbursement claims falsely attributed to plaintiff are defamatory); *Clevenger v. Baker Voorhis & Co.*, 8 N.Y.2d 187, 190 (1960) (well-known attorney-commentator on New York civil practice was falsely attributed with revisions to practice book which allegedly contained several errors); *Ben-Oliel v. Press Pub. Co.*, 251 N.Y. 250, 255 (1929) (false attribution of authorship of newspaper article is defamatory).

The false attribution of the text messages to plaintiff falls squarely within the parameters

of this controlling precedent. At a minimum, the fabricated text messages place plaintiff in a place where he was never assigned, to assist a person he had never met, and attribute a misuse of his authority when he was retired as a Secret Service agent. The fabricated text messages are themselves defamatory in isolation, but are even more emphatically defamatory in the context of the Article as a whole for the reasons set forth above.

* * *

As the result of the foregoing, the Article is reasonably susceptible to a defamatory meaning(s).

## POINT III

### PLAINTIFF SHOULD BE GRANTED LEAVE TO AMEND THE COMPLAINT

Plaintiff submits that the allegations of the Complaint are sufficient to plausibly allege a claim of defamation per se without the need to plead extrinsic facts. *See Hinsdale v Orange County Publications, Inc.*, 17 N.Y.2d 284, 287-88 (1966) (publication of an engagement announcement between two persons widely known to be already married was libelous per se without necessity of special damages). Typical readers of the Article were extremely likely to be well aware of the widely reported publications of the fabricated text messages, which were also expressly quoted and referenced in the 2021 hyperlinked article.

Even assuming, *arguendo*, that extrinsic facts relating to the previous publications of the fabricated text messages and their attribution to plaintiff are necessary to provide context for the defamatory connotations, plaintiff should be provided with leave to amend. Additionally, because sufficient allegations of special damages are required for libel per quod, *Henry v. Fox News Network LLC*, 629 F.Supp.3d 136, 150-51 (S.D.N.Y 2022), leave should be provided to plaintiff to allege special damages as set forth in the accompanying Declaration of plaintiff Lorenzo Robert

16

Savage III.

Also, in the event that the Court determines that it is not self-evident that the false reporting of plaintiff's misconduct as a rogue vigilante, who engaged in unauthorized law enforcement work, and provided improper and surreptitious cover to benefit the Biden family, are inimical to the business of a provider of security services, plaintiff requests leave to amend to set forth such allegations. (*See* Declaration of plaintiff Lorenzo Robert Savage III).

Fed. R. Civ. P. 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." The decision to grant or deny leave "is within the sound discretion of the district court." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *Obra Pia Ltd. v. Seagrape Investors LLC*, 2021 WL 1978545, at *3, No. 19-cv-7840-RA (S.D.N.Y. May 18, 2021). This is especially true on the Court's first ruling on a motion to dismiss. *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies."). The Court may deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy*, 482 F.3d at 200.

Here, the additional allegations, if required to salvage plaintiff's claim for defamation, are not futile, in bad faith, unnecessarily delayed, or likely to result in any prejudice to the defendants.[13] Leave to amend should therefore be granted. *Winter v. Pinkins*, 2016 WL 1023319,

---

[13] Following the submission of pre-motion letters, the Court provided plaintiff with leave to amend the Complaint "if … he can assert additional allegations to cure any alleged deficiencies **raised by defendants' letter**…" (emphasis added). [ECF 18, dated September 10, 2024]. Defendant's letter was limited to the contention that the Complaint was not reasonably susceptible to a defamatory meaning and did not raise libel per quod issues, although concededly, neither did the

at *8, No. 14-cv-8817-RKS (S.D.N.Y March 8, 2016) ("Plaintiffs allegations for false light invasion of privacy and defamation, if augmented by Plaintiffs allegations regarding the location, timing, content, and viewership of Defendant's statements that were improperly made in his opposition brief, might amount to plausible claims.").

## <u>CONCLUSION</u>

For all of the above reasons, (i) the motion to dismiss should be denied in all respects; (ii) alternatively, plaintiff should be granted leave to file an amended complaint; and (iii) it is respectfully requested that the Court direct such other and further relief as it may deem just and proper.

Dated:  Garden City, New York
        January 2, 2025

Respectfully submitted,

Law Office of Mark E. Goidell
*Attorney for Plaintiff*

<u>/s Mark E. Goidell</u>
By: Mark E. Goidell
666 Old Country Road, Suite 700
Garden City, New York 11530
Tel. (516) 683-0001
mark@goidell.com

---

Complaint.