UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X

LORENZO ROBERT SAVAGE III,

                Plaintiff,

   - against –

NYP HOLDINGS, INC. d/b/a NEW
YORK POST, MIRANDA DEVINE, and
JONATHAN LEVINE,

            Defendants.

------------------------------X

LORENZO ROBERT SAVAGE III,

                Plaintiff,

   - against –

ASSOCIATED NEWSPAPERS LTD., and
MAIL MEDIA, INC.,

            Defendants.

------------------------------X

**MEMORANDUM AND ORDER**

24 Civ. 3278 (NRB)

24 Civ. 3280 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Lorenzo Robert Savage III, a retired Secret Service agent, filed two defamation lawsuits relating to reports about him and Hunter Biden, the son of former President Joseph R. Biden, Jr. At issue are three publications reporting that Savage purportedly ended Hunter Biden's "hooker and drug-fueled binge" when he "texted [Hunter Biden] threatening to break into [his hotel] room." Savage contends that this statement, along with others made in the at-

-1-

issue tweets and articles, constitute defamation per se. Defendants in both lawsuits move to dismiss Savage's complaints under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants defendants' motions and dismisses both cases.

**BACKGROUND**

I.    **Factual Background**[1]

Plaintiff is a 25-year veteran of the United States Secret Service who, before retiring in April 2018, "led the USSS Los Angeles Field Office– the third largest of the Secret Service's 42 field offices" in which he "oversaw all Secret Service protective, investigative, and protective intelligence operations conducted by that office."  See No. 24-cv-03278, ECF No. 1 ¶¶ 2, 12, 15; No. 24-cv-03280, ECF No. 1 ¶¶ 2, 12, 15.  Since his retirement from the Secret Service, plaintiff has worked in the private sector, becoming the chief executive officer of a major private security company and then in 2022, founding his own private security

---

[1]    Unless otherwise noted, the facts set forth below are drawn from the well-pleaded allegations in plaintiff's complaints and are accepted as true for purposes of this opinion.  See Wilson v. Dynatone Publ'g Co., 892 F.3d 112, 117 (2d Cir. 2018).  We also draw facts from the at-issue publications themselves, as a court on a motion to dismiss may consider documents that "are incorporated by reference and/or integral to the amended complaint" and "these publications provide the entire basis for plaintiff's claims."  Bloom v. A360 Media LLC, 735 F. Supp. 3d 466, 471 (S.D.N.Y. 2024) (collecting cases); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (holding a court may consider a document incorporated by reference as well as a document integral to the complaint).

company.  See No. 24-cv-03278, ECF No. 1 ¶¶ 16, 17; No. 24-cv-03280, ECF No. 1 ¶¶ 16, 17.

Three publications are at-issue.  The first publication, which we will refer to as the "Tweets," consists of a series of posts made in September 2023 on the social media site X, formerly known as "Twitter."  No. 24-cv-03278, ECF No. 1 ¶ 26, ECF No. 27-1 (the Tweets) at 1.[2]  The second publication is an article issued by the New York Post in September 2023, which we will refer to as the "New York Post Article."  See No. 24-cv-03278, ECF No. 1-2. The last publication is an article reported by the Daily Mail in October 2023, which we will refer to as the "Daily Mail Article." No. 24-cv-03280, ECF No. 1 ¶ 27, ECF No. 27-1 (the Article) at 1.[3] We review each publication in turn.

**a. The Tweets**

In the Tweets, New York Post journalist Miranda Devine asserted that plaintiff was "featured prominently" on "Hunter

---

[2]    Plaintiff included an excerpted version of the Tweets as Exhibit A to the Complaint, No. 24-cv-03278, ECF No. 1-1, but the excerpt does not provide the full text from all eight posts, see id., and the Court relies upon the complete version of the Tweets, as provided in Exhibit 1 to the Declaration of Robert D. Balin, No. 24-cv-03278, ECF No. 27-1.  The Court may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral to the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

[3]    Plaintiff did not attach the article to the Complaint, but defendants Associated Newspapers LTD. and Mail Media, Inc. provided it as Exhibit 1 to the Declaration of Robert D. Balin.  See No. 24-cv-03280, ECF No. 27-1.  The Court may consider this article as it is incorporated by reference in the complaint and is otherwise integral to the complaint.  See DiFolco, 622 F.3d at 111.

-3-

Biden's laptop" and recounted an incident from 2018 in which Savage purportedly contacted Mr. Biden.  No. 24-cv-03278, ECF No. 1 ¶ 26, ECF No. 27-1 (the Tweets) at 1.

According to defendant Devine's recounting, Hunter Biden was "on a bender" in 2018 when he "order[ed] an escort."  No. 24-cv-03278, ECF No. 27-1 at 1.  Because "none of his debit cards work[ed]" "when he trie[d] to pay her the $8,000 he owe[d]," Hunter Biden purportedly used a "card that's linked to his dad's account" and accidentally charged $25,000 to the account.  Id. at 1, 2.  Shortly thereafter, "[t]ext messages start[ed] arriving from Robert Savage III, ex special agent in charge of the LA field office.  His contact card is on Hunter's laptop, with photograph, phone number and USSS email address."  Id. at 2.  Savage was downstairs from Mr. Biden's hotel room "demanding Hunter let him in."  Id.  According to the Tweets, plaintiff texted Hunter "Come on H, this is linked to Celtic's account. DC is calling me every 10" and "'Celtic' was Joe Biden's Secret Service code name."  Id. at 3.  Ms. Devine advertised that "You can read the whole saga in my book #LaptopFromHell" and posted a link to purchase her book. Id.

As part of the Tweets, Ms. Devine published a screenshot of text messages exchanged purportedly between plaintiff and Hunter Biden.  Id. at 4.  The Court reproduces the screenshot of these

-4-

messages below:



Id.  Plaintiff contends that these text messages are "fabricated." No. 24-cv-03278, ECF No. 1 ¶ 3.[4]

As part of the Tweets, Ms. Devine cited an unrelated civil complaint in which Savage was accused of accepting bribes.  See No. 24-cv-03278, ECF No. 27-1 at 1, 4.  Plaintiff does not challenge this aspect of the Tweets.  The Honorable Michael W. Fitzgerald of the Central District of California later dismissed the claims from that unrelated civil complaint against Savage. See Psalia v. Girardi, No. 2:23-cv-07120-MWF-SK, ECF No. 134 (C.D.

---

[4]    Defendants note that they will dispute this claim if the case proceeds. See No. 24-cv-03278, ECF No. 14 at 2 n.3, ECF No. 26 at 7 n.9; No. 24-cv-03280, ECF No. 16 at 2 n.4, ECF No. 26 at 5 n.6.

Cal. Nov. 13, 2024).

### b. The New York Post Article

The next at-issue report, the New York Post article, was published on September 2, 2023, a day after the Tweets were posted. See No. 24-cv-03278, ECF No. 1 ¶ 27, ECF No. 1-2 (the Article). Written by defendants Miranda Devine and Jonathan Levine, the article is entitled "Secret Service agent whose name appeared on Hunter Biden laptop bribed by Real Housewife: suit" and primarily focuses on allegations presented in the irrelevant California lawsuit. See No. 24-cv-03278, ECF No. 1-2.

Aside from the title, the article references Hunter Biden five times. The first sentence of the article alludes to plaintiff as "a Secret Service agent who once reportedly had ties to Hunter Biden." Id. at 1. A photo caption similarly states that "[t]he suit also named former Secret Service agent Robert Savage, who once reportedly had ties to Hunter Biden." Id. at 4-5. Another photo caption adds that Savage is a "Secret Service agent who once provided critical assistance to Hunter Biden." Id. at 3. The remaining two references are reproduced below:

> Text messages labeled as being from Robert Savage III were reportedly found on the first son's abandoned laptop.
>
> Savage's lawyer has insisted to The Post that "my client has never met or communicated with Hunter Biden."

Id. at 2.

**c. The Daily Mail Article**

The last at-issue report, the Daily Mail Article, was published on October 2, 2023 and concerned "suspicious financial transactions that appeared to be related to [Hunter Biden's] hiring of prostitutes."  No. 24-cv-03280, ECF No. 1 ¶ 27, ECF No. 27-1 (the Article) at 1.  The article primarily focuses on a Suspicious Activity Report filed by Wells Fargo financial investigators which purportedly stated that Hunter Biden "sent money to individuals who may be part of an Eastern European prostitution ring."  No. 24-cv-03280, ECF No. 27-1 at 2.

Towards the end of the article, the Daily Mail cites its earlier reporting that Hunter Biden "wired $25,000 during a hooker and drug-fueled binge at a Los Angeles Hotel in May 2018" and provides a hyperlink to its previous reporting about the subject. No. 24-cv-03280, ECF No. 27-1 at 14.  The last two paragraphs of the article reference Messrs. Biden and Savage and are reproduced here:

> [Hunter Biden's] binge only ended on May 24, 2018 when then-recently retired LA Secret Service chief Robert Savage texted him threatening to break into the room, telling him that 'DC is calling me every 10' and that he was working on 'Celtic's account' – the Secret Service codename for Joe Biden when he was Vice President.
>
> Savage has denied having any involvement with Hunter, and the Secret Service say that they were not providing any protections for the Bidens at the time.

Id. at 15.

-7-

## II.  Procedural History

Plaintiff filed two lawsuits on April 30, 2024.  See No. 24-cv-03278, ECF No. 1; No. 24-cv-03280, ECF No. 1.  In the first lawsuit, plaintiff asserts a defamation claim against defendants associated with the Tweets and New York Post Article.  See No. 24-cv-03278, ECF No. 1 ¶¶ 6-8.[5]  In the second lawsuit, plaintiff asserts a nearly identical defamation claim against defendants associated with the Daily Mail Article.  See No. 24-cv-03280, ECF No. 1 ¶¶ 6-8.[6]  Neither Hunter Biden nor his father are included as parties in the two lawsuits.

On June 3, 2024, the parties filed a letter stating that the two lawsuits were related and requested that they both be assigned to this Court to "avoid unnecessary duplication of judicial effort . . . and the possibility of conflicting orders and legal rulings."  No. 24-cv-03280, ECF No. 11 at 2 (citation and quotation marks omitted).  The parties noted that "Paragraphs 1-5 and 11-19 are identical in both complaints" while "Paragraphs 25-26 and 32-36" of the complaint in the action relating to the Tweets and New York Post Article "are identical to" "Paragraphs 24-25 and 34-38 of the complaint" in the action relating to the Daily Mail Article.  Id.

---

[5]    Specifically, defendants in this lawsuit include NYP Holdings, Inc., the publisher of the New York Post, as well New York Post journalists Miranda Devine and Jonathan Levine.  See No. 24-cv-03278, ECF No. 1 ¶¶ 6-8.

[6]    Defendants Associated Newspapers LTD. and Mail Media, Inc. allegedly publish the Daily Mail news site.  See No. 24-cv-03280, ECF No. 1 ¶¶ 6-8.

at 2 n.3.  The second lawsuit relating to the Daily Mail Article was accordingly reassigned to this Court on June 6, 2024.  See No. 24-cv-03280.

In August 2024, defendants in both lawsuits filed pre-motion letters describing their anticipated motions to dismiss.  See No. 24-cv-03278, ECF No. 14; No. 24-cv-03280, ECF No. 16.  In both letters, defendants argued that the relevant publications were not reasonably susceptible to any defamatory meaning with respect to Mr. Savage.  See id.  In response, plaintiff contended that the publications were per se defamatory, and in the alternative, constituted "libel by extrinsic fact (libel per quod)."  No. 24-cv-03278, ECF No. 15; No. 24-cv-03280, ECF No. 17.  Plaintiff also asserted that "[e]ven if special damages are required . . . plaintiff has adequately set forth the lost business opportunities arising from the" relevant publications.  See id.

The Court granted defendants leave to file their motion without the necessity of a pre-motion conference.  See No. 24-cv-03278, ECF No. 16; No. 24-cv-03280, ECF No. 18.  The Court reminded plaintiff that "if, consistent with Rule 11, he can assert additional allegations to cure any alleged deficiencies raised by defendants' letter, it would be in the best interest of both the parties and the Court for plaintiff to assert them now, before briefing on the proposed motions" and granted plaintiff leave to

-9-

file an amended complaint.  <u>See</u> <u>id.</u>

Plaintiff chose to not file an amended complaint in either case.  <u>See</u> No. 24-cv-03278, ECF No. 19; No. 24-cv-03280, ECF No. 19.  Defendants thereafter filed their motions to dismiss in November 2024.  <u>See</u> No. 24-cv-03278, ECF Nos. 25, 26; No. 24-cv-03280, ECF Nos. 25, 26.  Plaintiff opposed defendants' motions in January 2025, <u>see</u> No. 24-cv-03278, ECF No. 31; No. 24-cv-03280, ECF No. 31, and defendants filed a reply in late February 2025, <u>see</u> No. 24-cv-03278, ECF No. 37; No. 24-cv-03280, ECF No. 37.

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a non-movant's pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the pleaded fact[s] . . . allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>  A court "must accept as true all factual claims in the complaint and draw all reasonable inferences in the plaintiff's favor."  <u>Sacerdote v. Cammack Larhette Advisors, LLC</u>, 939 F.3d 498, 507 (2d Cir. 2019).  However, "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  <u>Brown</u>

-10-

v. Daikin Am., Inc., 756 F.3d 219, 225 (2d Cir. 2014) (quoting Iqbal, 556 U.S. at 678).

In evaluating the sufficiency of a complaint, a district court may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral to the complaint.  See DiFolco, 622 F.3d at 111.  The court may also consider "matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation and quotation marks omitted).

## DISCUSSION

In the discussion below, we address plaintiff's: (1) inadequate defamation claims; and (2) belated requests to amend his complaints.

## I. Defamation Claims

The first issue raised by the parties is whether plaintiff's defamation claims are adequately pled.  See No. 24-cv-03278, ECF Nos. 1, 25, 26, 31, 37; No. 24-cv-03280, ECF Nos. 1, 25, 26, 31, 37.  We first review the standard for pleading an adequate defamation claim before applying it to plaintiff's allegations.

### a. Standard

"To state a claim for defamation under New York law, a plaintiff must allege that the defendant made a statement that was: (1) false, defamatory, and of and concerning the plaintiff;

-11-

(2) published to a third party; (3) made with the applicable level of fault; and (4) defamatory per se or caused the plaintiff special harm." Enigma Software Grp. USA, LLC v. Bleeping Computer LLC, 194 F. Supp. 3d 263, 280 (S.D.N.Y. 2016) (citing cases).[7]

To satisfy the first element, a plaintiff "must identify a plausible defamatory meaning of the challenged statement or publication." Van Buskirk v. The New York Times Co., 325 F.3d 87, 90 (2d Cir. 2003) (citation and quotation marks omitted). A statement is defamatory "if it exposes an individual 'to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation or disgrace, or . . . induce[s] an evil opinion of one in the minds of right-thinking persons, and . . . deprive[s] one of their confidence and friendly intercourse in society.'" Chau v. Lewis, 771 F.3d 118, 127 (2d Cir. 2014) (citation omitted). "To be actionable, therefore, the statement must do more than cause discomfort or affront; the statement is measured not by the sensitivities of the maligned, but the critique of reasonable minds that would think the speech attributes odious or despicable characterizations to its subject." Id.

"While it falls to the jury to determine if a plaintiff was actually defamed, a court must decide as a threshold issue if the

---

[7]    Both parties agree that New York law applies. See No. 24-cv-03278, ECF No. 26 at 9-10, ECF No. 31 at 8; No. 24-cv-03280, ECF No. 26 at 6-8, ECF No. 31 at 8.

[alleged] defamatory statement 'is reasonably susceptible to the defamatory meaning imputed to it.'"  Van Buskirk, 325 F.3d at 90 (citation omitted).  When making this judgment, "the court must read the offending words in the context of the whole article and test them against 'the understanding of the average reader.'"  Idema v. Wager, 29 F. App'x 676, 678 (2d Cir. 2002) (quoting Celle v. Filipino Reporter Enters., 209 F.3d 163, 177 (2d Cir. 2000)).

"Courts should not 'strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous.'"  Belya v. Hilarion, No. 20 Civ. 6597 (VM), 2021 WL 1997547, at *5 (S.D.N.Y. May 19, 2021) (quoting November v. Time Inc., 13 N.Y.2d 175, 178 (N.Y. 1963)), appeal dismissed sub nom. Belya v. Kapral, 45 F.4th 621 (2d Cir. 2022).  At the same time, "it is equally clear that courts should not strain to interpret statements as defamatory," Pavlica v. Behr, No. 03 Civ. 9628 (DC), 2006 WL 1596763, at *7 (S.D.N.Y. June 12, 2006), and the New York Court of Appeals has "explained that there is 'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms,'" Biro v. Conde Nast, 883 F. Supp. 2d 441, 457 (S.D.N.Y. 2012) (quoting Armstrong v. Simon & Schuster, Inc., 85 N.Y.2d 373, 379 (1995)).

**b. Parties' Positions**

Defendants contend that the relevant publications are not reasonably susceptible to any defamatory meaning with respect to Savage.  <u>See</u> No. 24-cv-03278, ECF Nos. 26, 37; No. 24-cv-03280, ECF Nos. 26, 37.  Plaintiff disagrees, arguing that (1) the publications' defamatory meaning is "readily apparent" upon a "cursory review" of the publications, and (2) the publications are "reasonably susceptible to a defamatory connotation because of the context in which it was published."  <u>See</u> No. 24-cv-03278, ECF No. 31 at 5, 10-16; No. 24-cv-03280, ECF No. 31 at 5, 10-15.  We address each of plaintiff's arguments below.

**i. No Direct Defamatory Meaning**

The publications assert, in sum and substance, that: (1) Hunter Biden was purportedly engaging in illegal activities while on a "binge" or "bender"; (2) Savage was getting calls from "DC" relating to Hunter Biden's activities; (3) Savage had "ties" to Hunter Biden; and (4) Savage provided Hunter Biden with "critical assistance" by texting Hunter Biden "demanding Hunter let him" into the hotel room, thereby "end[ing]" Mr. Biden's "binge."  <u>See</u> No. 24-cv-03278, ECF No. 27-1 (the Tweets), ECF No. 1-2 (New York Post Article); No. 24-cv-03280, ECF No. 27-1 (Daily Mail Article). To read a defamatory meaning from these publications would violate

-14-

the familiar maxim that "courts should not strain to interpret statements as defamatory."  Behr, 2006 WL 1596763, at *7.

Plaintiff alleges otherwise, specifically contending that the relevant publications are defamatory because they "directly accuse Mr. Savage of [1] abusing his position, [2] engaging in illegal misconduct, [3] covering up the purported illicit activities of Hunter Biden, [4] unfitness to perform the duties and [5] responsibilities of his profession, and the absence of integrity in the discharge of his duties."  No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280, ECF No. 1 ¶ 39.

Plaintiff's specific allegations are implausible interpretations of the at-issue publications.  First, plaintiff alleges that the publications "directly accuse Mr. Savage of abusing his position."  No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280, ECF No. 1 ¶ 39.  To this end, plaintiff argues that the "gist of the publication is that . . . plaintiff misused his authority as a retired Secret Service agent to extract Hunter Biden from difficulty."  No. 24-cv-03278, ECF No. 31 at 10-11; No. 24-cv-03280, ECF No. 31 at 10.  However, the publications note that Savage did not have an official government position at the time of the incident, and do not suggest that Savage "misused" this unofficial position.[8]  Moreover, the publications contain no

---

[8]    Despite citing cases where an individual is disparaged for performance of

-15-

accusation that Mr. Savage abused his position of "ex special agent" by texting the son of the former Vice President and showing up at his hotel when Hunter Biden was purportedly on a "binge." See No. 24-cv-03278, ECF No. 27-1 (the Tweets), ECF No. 1-2 (New York Post Article); No. 24-cv-03280, ECF No. 27-1 (Daily Mail Article).    "At worst, [these publications] question[] the plaintiff's professional credentials;" however, "defamation law is not available in cases of mere 'discomfort or affront.'"  Rahiman v. Bjarke Ingels Grp., NYC LLC, No. 23 Civ. 3505 (AMD) (VMS), 2024 WL 4932748, at *4 (E.D.N.Y. Dec. 2, 2024) (quoting Chau, 771 F.3d at 127).

Second, plaintiff alleges that the publications "directly accuse Mr. Savage of . . . engaging in illegal misconduct."  No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280, ECF No. 1 ¶ 39. There is no basis for this allegation.  The publications are clear: Hunter Biden was purportedly engaged in law-breaking activities until Savage supposedly ended Hunter Biden's activities by texting him and demanding that he be let into Mr. Biden's hotel room.  The publications "fall[] well short of accusing [plaintiff of] violating any laws."  Greenberg v. Spitzer, 62 N.Y.S.3d 372, 393–94 (2d Dep't 2017).  In any event, plaintiff never specifies what

his or her official government duties, plaintiff offers no explanation for how these cases are analogous to this precise factual scenario.  See No. 24-cv-03278, ECF No. 31 at 14-15; No. 24-cv-03280, ECF No. 31 at 13.

law he could be accused of violating in his complaint or in his opposition brief.

Third, plaintiff alleges that the publications "directly accuse Mr. Savage of . . . covering up the purported illicit activities of Hunter Biden." No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280, ECF No. 1 ¶ 39. This allegation is unsupported by the publications themselves. The publications' recounting of the 2018 incident stops at the hotel door. They do not detail what Mr. Savage supposedly did after he purportedly sent the last text message to Mr. Biden. In short, the publications do not accuse Mr. Savage of anything inappropriate, much less acts that "rise to the odium necessary to constitute defamatory meaning." Chau, 771 F.3d at 128.

Fourth, while plaintiff alleges that the publications "directly accuse Mr. Savage of . . . unfitness to perform the duties and responsibilities of his profession," No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280, ECF No. 1 ¶ 39, he also argues that the "gist" of the publications is that "plaintiff provided unauthorized protection and services to Hunter Biden," see No. 24-cv-03278, ECF No. 31 at 10-11; No. 24-cv-03280, ECF No. 31 at 10. Plaintiff's allegations and arguments conflict with each other, as the publications cannot both be saying that he was "unfit" to provide protection and services, while also saying that he

-17-

"provided . . . protection and services."  No. 24-cv-03278, ECF
No. 1 ¶ 41, ECF No. 31 at 10-11; No. 24-cv-03280, ECF No. 1 ¶ 39,
ECF No. 31 at 10.  Thus, this allegation fails, as "[t]here is no
suggestion in the [allegation] that the statement impugned
[Savage's] reputation or that it indicated that he was generally
incompetent or unable to be trusted in performing his duties."
Pantheon Props., Inc. v. Houston, No. 20 Civ. 3241 (ALC), 2021 WL
4523619, at *3 (S.D.N.Y. Sept. 30, 2021).

Lastly, plaintiff alleges that the publications "directly
accuse Mr. Savage of . . . the absence of integrity in the discharge
of his duties."  No. 24-cv-03278, ECF No. 1 ¶ 41; No. 24-cv-03280,
ECF No. 1 ¶ 39.  Plaintiff expands upon this conclusory allegation
in his opposition briefs, arguing that the publications depicted
plaintiff as a "political partisan" who "surreptitiously undertook
an unauthorized protective assignment following his retirement."
See No. 24-cv-03278, ECF No. 31 at 1, 10-11; No. 24-cv-03280, ECF
No. 31 at 1, 10.  Plaintiff also argues that the publications
depict "plaintiff as a rogue law enforcement officer in the
performance of ex-officio political or personal favors, who
disregarded protocols and lines of command to protect the son of
the former Vice President of the United States."  See No. 24-cv-
03278, ECF No. 31 at 11; No. 24-cv-03280, ECF No. 31 at 10.

-18-

There is nothing "surreptitious" about Mr. Savage's purported activity, especially given that plaintiff's post-Secret Service work is in the private security field. See No. 24-cv-03278, ECF No. 1 ¶¶ 16, 17; No. 24-cv-03280, ECF No. 1 ¶¶ 16, 17. Indeed, the purported fact that he was trusted "to protect the son of the former Vice President of the United States" speaks highly of his ability to discharge his duties. See No. 24-cv-03278, ECF No. 31 at 11; No. 24-cv-03280, ECF No. 31 at 10. "[W]hile Plaintiff argues that the article and statements in it are defamatory, the laudatory nature of language in the statements render them not actionable." Wang v. Ninety-Nines, Inc., No. 18 Civ. 1780 (LAK) (KHP), 2021 WL 9525176, at *5 (S.D.N.Y. July 17, 2021), report and recommendation adopted sub nom. Wang v. New York-New Jersey Section of Ninety-Nines Inc., No. 18 Civ. 1780 (LAK), 2021 WL 9525162 (S.D.N.Y. Sept. 13, 2021).

In sum, the relevant publications have no defamatory meaning as plaintiff's characterizations cannot be found in the text of the at-issue articles and tweets.

### ii. No Defamatory Meaning "With Context"

Perhaps sensing the futility of his claims, plaintiff argues that the publications are "reasonably susceptible to a defamatory connotation because of the context in which [they were] published." See No. 24-cv-03278, ECF No. 31 at 1-2, 5-7, 11-12, 15-17; No. 24-

-19-

cv-03280, ECF No. 31 at 5-6, 10-12, 14-16.  As for the relevant context, plaintiff contends that "[t]ypical readers of the [publications] were extremely likely to be well aware of the widely reported publications of the fabricated text messages."  See No. 24-cv-03278, ECF No. 31 at 17; No. 24-cv-03280, ECF No. 31 at 16.

Plaintiff attempts to expand the publications' context by citing three examples of "public reporting of the text messages and intervention falsely attributed to plaintiff" to establish that the at-issue publications were defamatory.  See No. 24-cv-03278, ECF No. 31 at 1-2, 6-7, 11-12, 15-17; No. 24-cv-03280, ECF No. 31 at 1, 6, 10-11, 14-16.  One of these examples is a February 2023 statement of Rep. James Comer, Chairman of the United States Congressional House Oversight Committee, announcing "an investigation into what he characterized as the 'bizarre' conduct of the USSS, specifically identifying the (false) reports of plaintiff's May 2018 alleged interaction with Hunter Biden."  Id. Another example is an October 2022 report, known as the "Marco Polo Report," which provides more detail on the May 2018 alleged interaction.  Id.; No. 24-cv-03278, ECF No. 32-2 (Excerpt of Marco Polo Report); No. 24-cv-03280, ECF No. 32-2 (same).  The third example is specific to the Daily Mail Article.  Because the Daily Mail Article provides a hyperlink to its previous reporting about the subject, plaintiff argues typical readers "were extremely

-20-

likely to be well aware of the . . . 2021 hyperlinked article." No. 24-cv-03280, ECF No. 31 at 16.

There are multiple issues with plaintiff's arguments. First, under New York law, "statements cannot be [defamatory] per se if reference to extrinsic facts is necessary to give them a defamatory import." Aronson v. Wiersma, 65 N.Y.2d 592, 594-95 (1985). Simply put, plaintiff cannot rely on these extrinsic publications to prove his defamation per se claims. Plaintiff admits as much and moves to amend his complaint to file libel per quod claims, so that he could allege "extrinsic facts relating to the previous publications of the fabricated text messages and their attribution to plaintiff are necessary to provide context for the defamatory connotations." No. 24-cv-03278, ECF No. 31 at 17; No. 24-cv-03280, ECF No. 31 at 16. We address this argument further below. See infra pp. 22-26.

Second, "the court must read the offending words in the context of the whole article and test them against 'the understanding of the average reader.'" Idema, 29 F. App'x at 678 (citation omitted). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." Celle, 209 F.3d at 177 (citation and quotation marks omitted; emphasis in original). The cited examples of "public reporting of

the text messages" all predate the at-issue publications and do not reflect the average reader's understanding of the at-issue publications.

Third, any claims based on the cited examples of "public reporting of the text messages" are time-barred.  The statute of limitations for defamation is one year, see N.Y. C.P.L.R. § 215, "which generally accrues [from] the date of the first publication," Biro v. Conde Nast, 171 A.D.3d 463, 464 (1st Dep't 2019) (citation omitted).  The mere "publication of a hyperlink," or a "reference" to an article that "does not restate the defamatory material," "is not a republication of the material" sufficient to restart the statute of limitations.  Lindberg v. Dow Jones & Co., Inc., No. 20 Civ. 8231 (LAK), 2021 WL 3605621, at *5 (S.D.N.Y. Aug. 11, 2021) (collecting cases).  Accordingly, the two cited examples which are not referenced in the at-issue publications cannot serve as a basis for plaintiff's defamation claims, and the 2021 hyperlinked article referenced in the Daily Mail Article is time-barred as well.

## II.  Leave to Amend Complaints

We now turn to plaintiff's requests to amend his complaints. See No. 24-cv-03278, ECF No. 31 at 17-19; No. 24-cv-03280, ECF No. 31 at 16-18.  In his opposition to defendants' motions to dismiss, plaintiff concedes that "the Complaint[s] . . . did not raise libel

per quod issues."  No. 24-cv-03278, ECF No. 31 at 18-19 n.13; No.
24-cv-03280, ECF No. 31 at 17-18 n.13.  Accordingly, plaintiff
requests leave to amend his complaints so that he can allege the
required elements of a libel per quod claim: (1) "extrinsic facts
relating to the previous publications of the fabricated text
messages and their attribution to plaintiff . . . to provide
context for the defamatory connotations" and (2) "special damages
as set forth" in an accompanying declaration to establish that
"the false reporting of plaintiff's misconduct as a rogue
vigilante, who engaged in unauthorized law enforcement work, and
provided improper and surreptitious cover to benefit the Biden
family, are inimical to the business of a provider of security
services."  See No. 24-cv-03278, ECF No. 31 at 17-19; No. 24-cv-
03280, ECF No. 31 at 16-18.

Plaintiff could have added his proposed allegations to his
pleadings but chose not to.  As in their motions to dismiss,
defendants' pre-motion letters argued that the relevant
publications were not reasonably susceptible to any defamatory
meaning with respect to Mr. Savage.  See No. 24-cv-03278, ECF Nos.
14, 26, 37; No. 24-cv-03280, ECF No. 16, 26, 37.  In response,
plaintiff raised many of the same arguments that he does today,
namely that: (1) the publications were per se defamatory, (2) the
publications constituted "libel by extrinsic fact (libel per

-23-

quod)," and (3) "[e]ven if special damages are required . . .
plaintiff has adequately set forth the lost business opportunities
arising from the" relevant publications.   No. 24-cv-03278, ECF
Nos. 15, 31; No. 24-cv-03280, ECF Nos. 17, 31.   The Court granted
plaintiff leave to file an amended complaint.   See No. 24-cv-
03278, ECF No. 16; No. 24-cv-03280, ECF No. 18.  However, plaintiff
elected not to file one in either case.   See No. 24-cv-03278, ECF
No. 19; No. 24-cv-03280, ECF No. 19.   Plainly stated, plaintiff
was afforded an opportunity to amend his initial complaint, with
full knowledge of defendants' view of the defects in the pleadings,
yet failed to do so.

Moreover, plaintiff's proposed libel per quod claims are
futile.   See No. 24-cv-03278, ECF Nos. 1, 25, 26, 31, 37; No. 24-
cv-03280, ECF Nos. 1, 25, 26, 31, 37.   Libel per quod, like
defamation per se, requires the disputed statements to be
reasonably susceptible to a defamatory meaning with respect to Mr.
Savage.   See Idema v. Wager, 120 F. Supp. 2d 361, 368 (S.D.N.Y.
2000), aff'd, 29 F. App'x 676 (2d Cir. 2002).  Dismissal is still
appropriate where "the plain and obvious meaning of the challenged
language cannot be altered or changed by innuendo."   Id.  Here,
even reading the asserted extrinsic examples cited by plaintiff,
nothing in the language of the at-issue publications can be read
to contain defamatory innuendo that would "subject the plaintiff

to contempt, aversion," id., or "rise to the odium necessary to constitute defamatory meaning," Chau, 771 F.3d at 128; see supra pp. 14-19; see also Kavanagh v. Zwilling, 997 F. Supp. 2d 241, 255 (S.D.N.Y. 2014) (dismissing libel per quod claim, in part, because "Plaintiff's allegations are belied by the language of Defendants' statement"), aff'd, 578 F. App'x 24 (2d Cir. 2014).  We thus have no reason to believe that an amended complaint will be well-pled. Therefore, denial of plaintiff's request is more than appropriate. See McLaughlin v. Anderson, 962 F.2d 187, 195 (2d Cir. 1992) (affirming district court's denial of leave to amend where plaintiffs "already had one opportunity to amend their pleadings"); Hayden v. Cnty. of Nassau, 180 F.3d 42, 53-54 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."); NRW, Inc. v. Bindra, No. 12 Civ. 8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of having another bite at the proverbial apple." (citation and quotation marks omitted)).

## CONCLUSION[9]

For the foregoing reasons, defendants' motions are granted and plaintiff's requests for leave to file an amended complaint are denied.  The Clerk of Court is respectfully directed to terminate all pending motions, enter judgment for all defendants, and close the cases.

Dated:   September 19, 2025
         New York, New York

_____
         NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[9]     The Court understands that all parties requested oral argument.  See No. 24-cv-03278, ECF Nos. 28, 34; No. 24-cv-03280, ECF Nos. 28, 34.  However, given that our decision is based on clear legal doctrine, the Court determined that oral argument would not be productive.